UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

v.

D-1 JOHN ANGELO,

              Defendant.

Case No. 20-cr-20599 (MFL)(CI)

Hon. Matthew F. Leitman

## DEFENDANT'S BRIEF IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Defendant John Angelo is entitled a judgment of acquittal on count one for two reasons. First, as a legal matter, the government's proofs at trial failed to establish the existence of a conspiracy to obtain "property" under federal wire fraud law. *Kelly* v. *United States*, 590 U.S. ___, 140 S. Ct. 1565 (2020). Second, as a factual matter, the government failed to present sufficient evidence to enable a reasonable juror to conclude that Angelo was aware of a conspiracy or a scheme to obtain crash reports by fraud, in which he participated. *United States v. Williams,* 998 F.3d 716, 729 (6th Cir. 2021).

### Procedural Background

On December 16, 2020, the government obtained an indictment charging John Angelo and others with conspiracy to commit wire fraud in relation to the

procurement and use of Michigan traffic crash reports (UD-10s) before they were made available to the public (count one) and other counts not relevant for this motion.  (Indictment, ECF No. 1.)  There were three superseding indictments, the last of which was returned on August 16, 2023.  (Third Superseding Indictment, ECF No. 441).  The jury trial solely on count one commenced on October 17, 2023.  At the conclusion of the government's proof, Angelo moved for a judgement of acquittal under Rule 29.  (ECF No. 508.)  The Court took the motion under advisement.  The defense did not present a case.  On the second day of deliberation, the jury returned a guilty verdict.  (Verdict Form, ECF No. 516.)  Angelo renewed the Rule 29 motion immediately after the verdict.  This Court asked for briefing on the motion.  (Minute Entry, November 1, 2023.)

## Rule 29 Standard

In determining a motion under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In making this determination, the trial court "does not weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir.1994).

## Argument

**A. Angelo must be acquitted on count one because, as a matter of law, crash reports are not "property" for purposes of a wire fraud conspiracy in violation of 18 U.S.C. § 1349.  And any "property" loss by LexisNexis was "incidental" – not an object of the conspiracy.**

To convict on count one, the government was required to prove the existence of a conspiracy and that the conspirators had the goal of depriving another of "property."  (Jury Instructions, ECF No. 514, PageID.11096.)  But because crash reports are not "property" under the wire fraud and conspiracy to commit wire fraud statutes, the government failed to meet its burden and acquittal is required.

The government may attempt to argue that evidence at trial established Angelo and others deprived LexisNexis of some property rights (in terms of lost sales or transaction fees), but such property deprivation, if any[1], was incidental to the scheme to obtain crash reports.

Count one charges John Angelo with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  The indictment alleges that John Angelo and others developed a scheme to:

> " a. Unlawfully obtain Crash Reports prior to a responsible person making the Crash Report available to the public, with many of the reports bearing a watermark reading "Unapproved Report."

---

[1]     When the reports are in the "unapproved" status, their value to LexisNexis is purely speculative as explained later in this brief.

b. Use information contained within these Stolen Crash Reports
to solicit automobile crash victims and direct them to businesses
owned and operated by Defendants…"

(Third Superseding Indictment, ECF No. 441, PageID.9107.)

The indictment further alleges that John Angelo and others conspired to "devise a scheme and artifice to defraud and obtain money or property in the custody, control, or possession of [LexisNexis] by means of false and fraudulent pretenses through the electronic transmission by wire of writings, signs, signals, pictures and sounds in interstate and foreign commerce, in violation of 18 U.S.C. § 1343."  (Id. at PageID.9111.)

1. <u>The downloaded crash reports are not "property" within the meaning of the wire fraud statute.</u>

In *Kelly* v. *United States*, 140 S. Ct. 1565 (2020), the Supreme Court provided guidance concerning the wire fraud statute by further (i) distinguishing "property" from the exercise of regulatory power, and (ii) explaining that an incidental byproduct of a fraud (even if foreseeable and foreseen) is not an object of the fraud.

Governor Chris Christie's Deputy Chief of Staff (along with two Port Authority officials) conspired to punish the mayor of Fort Lee, New Jersey due to the mayor's failure to support Christie's 2013 reelection bid.  For years, three George Washington Bridge lanes were dedicated to traffic coming from Fort Lee, New Jersey into New York.  But for four days, the coconspirators worked to have

4

only one lane dedicated to Fort Lee traffic.  The result was gridlock.  The coconspirators lied about the reason for the traffic shift (a traffic study) and made arrangements to have an extra toll worker present to mitigate further gridlock (so the toll worker assigned to the Fort Lee lane could take breaks and not stop the only Fort Lee traffic lane on the bridge).

The government argued the conspiracy's object was "property" within the meaning of the wire fraud statute for two reasons.  First, the government argued the conspirators sought to "commandeer" the bridge by "taking control" of the lanes.  *Id.* at 1572.  Second, the government argued the conspirators aimed to deprive the Port Authority of the costs of compensating the traffic engineers and back-up toll collectors.  *Id.*

Both these arguments failed for different reasons.  The Supreme Court, rejecting the government's first argument, held that "taking control" of the bridge lanes is not a taking of "property" under the wire fraud statute.

> [The conspirators] (of course) did not walk away with the lanes; nor did they take the lanes from the Government by converting them to a non-public use.  Rather, [the conspirators] regulated use of the lanes, as officials responsible for roadways so often do—allocating lanes as between different groups of drivers. . . . But still, *what* they did was alter a regulatory decision about the toll plaza's use—in effect, about which drivers had a "license" to use which lanes.  And under *Cleveland*, that run-of-the-mine exercise of regulatory power cannot count as the taking of property.

*Id.* at 1573.

*Cleveland* held gaming licenses issued by Louisiana were not "property" because they and their issuance are an exercise of regulatory power, which is not a property interest.  *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000).  "The State's 'intangible rights of allocation, exclusion and control'—its prerogatives over who should get a benefit and who should not—do 'not create a property interest.'"  *Kelly*, 140 S. Ct. at 1572 (citing *Cleveland,* 531 U.S. at 23).

After *Kelly*, the Second Circuit held that the Centers for Medicare & Medicaid Services's (CMS) confidential nonpublic information concerning its planned regulations is not "property" under the wire fraud statute.  *United States v. Blaszczak*, 56 F.4th 230, 243–44 (2nd Cir. 2022).  The *Blaszczak* court also noted that, even if CMS's information was disclosed, it nevertheless remains within CMS's exclusive control.  *Id*. at 244 (citing *Kelly*, 140 S. Ct. at 1572) (alteration in original) (internal quotations omitted).

In this case, access to the crash reports at issue is not distinguishable from the issuance of gaming licenses in *Cleveland*, access to bridge lanes in *Kelly*, or the access to confidential information in *Blaszczak*.  There were regulatory decisions to create crash reports, to control their use, to maintain the reports at LexisNexis, and to limit access in various ways (including timing).  The object of the conspiracy here was to obtain access to crash reports for the information contained therein, not property, and to alter the regulatory decision as to who can access crash report

information and when.  (Like the object in *Kelly* was to alter the regulatory

decision as to who had license to use bridge lanes.)

Indeed, a crash report form is required by Michigan's Motor Vehicle Code[2]

in order to compile information.  The pertinent statute provides, in relevant parts:

> The officer receiving the report, or his or her commanding officer, shall immediately forward each report to the director of the department of state police on forms prescribed by the director of the department of state police.  The forms shall be completed in full by the investigating officer. The director of the department of state police shall analyze each report relative to the cause of the reported accident and shall prepare information compiled from reports filed under this section for public use.

Mich. Comp. Laws § 257.622[3].

The purpose of these crash reports is to record information for the purpose of

furnishing statistical information about the number and cause of accidents and

other purposes as required by law.  (Id.)  This was confirmed by the trial testimony

of Detroit Police Department (DPD) officer Ewald.  (Trial Transcript, ECF No.

506, PageID.10862.)

The evidence at trial established that Carol Almeranti worked for the DPD

and had unique access to nonpublic information that she and former officer Karen

---

[2]    Act 300 of 1949; Mich. Comp. Laws § 257.923.

[3]    This state statute also happens to be noted in the top left corner box in every crash report admitted at trial.  See, for example, government exhibit 4022A which includes reports emailed by Karen Miller to Robert Rosett on May 27, 2015.  Also noted in the top corner box is "UD-10E" which is the official name of the form.

Miller accessed in order to provide it to Jayson and Robert Rosett. (Trial Transcript, ECF No. 504, PageID.10631–632.) Both Almeranti and Miller testified that they understood the purpose of obtaining the crash reports was to provide Jayson with the information needed to solicit crash victims to help his business. (Trial Transcript, ECF No. 504, PageID.10655 and ECF No. 503, PageID.10296–97.) Indeed, the government argued in its opening statement that the defendants wanted to obtain the crash reports before they are approved and made available to the public in order to contact crash victims before their competitors. (Trial Transcript, ECF No. 504, PageID.10492.)

This no different from the "market edge" noted in *Blaszczak*; "the information wasn't known to others, and . . . wasn't public." *Blaszczak*, 947 F.3d at 27. And also like the information at issue in *Blaszczak*, the crash reports (even though obtained by the defendants) remained within LexisNexis's and DPD's control. There was no trial testimony showing that, as a result of the alleged conspiracy, any crash reports were deleted.

The wire fraud statute does not capture gaming licenses obtained by fraud or the commandeering of bridge lanes. It does not capture CMS's confidential information about its planned changes to reimbursement rates for medical services. And the wire fraud statute does not capture access to DPD's crash reports.

This is consistent with the testimony at trial.  LexisNexis did not own the reports but rather kept them in storage for the agency's benefit, DPD in this case. (Trial Transcript, ECF No. 505, PageID.10740–743.)  During the time when reports were not approved by a DPD supervisor, LexisNexis had no authority to sell them.  (Id. at PageID.10751–752.)  LexisNexis could only sell the reports to the public after the status of a report was changed from "unapproved" to "complete" by DPD, which removed the watermark from the report.  (Id.)  A crash report could also be canceled by the agency.  (Id.)

Therefore, when the crash reports in question were in the "unapproved" status, LexisNexis possessed no identifiable property right in them.  They were still not complete (and may never be), could not be sold, and may never have been approved by a DPD supervisor for sale by LexisNexis.  There was no trial testimony as to the final status of any of the reports emailed by Miller[4] which were admitted into evidence in this case.  No one testified whether any of these reports was approved by a DPD supervisor (rendering them marketable) or cancelled by DPD, which is another possible outcome.

The taking was a copy of information—a copy of a crash report, which was gathered pursuant to state regulation.  This is less of a taking than occurred in *Kelly*

---

[4]     All the crash reports admitted as evidence at the trial entered "circulation" by an email sent by Miller, even though Almeranti testified that at times she downloaded and/or sent some reports.

where physical bridge lanes were commandeered. In this case, the crash reports remained in the possession, custody, and control of both DPD and LexisNexis after any copy was downloaded. DPD and LexisNexis never lost access to the unapproved crash reports—they could still be used and, if necessary approvals given, sold by LexisNexis. Assuming the number of gaming licenses issued by Louisiana are finite, the regulatory taking here is less than occurred in *Cleveland* as well. The taking of information here—changing the regulatory decision as to who has access to crash reports—is no different than the taking in *Blaszczak*.

The evidence at trial established, at best, a conspiracy to obtain something other than property. A judgment of acquittal should thus be entered for Angelo.

2. Any "property" loss by LexisNexis was "incidental" and not an object of any conspiracy.

The government's second argument in *Kelly* was that the defendants sought to deprive the Port Authority of "money" or "property" because the defendants sought to deprive the Port Authority of the costs of compensating the traffic engineers and back-up toll collectors. *Kelly*, 140 S. Ct. at 1572. However, the Supreme Court rejected this argument because the object of the conspiracy was to commandeer bridge lanes, not employee labor. "The time and labor of Port Authority employees were just the implementation costs of the [conspirators'] scheme to reallocate the Bridge's access lanes." *Id.* at 1574

Although "a scheme to usurp a public employee's paid time is one to take the government's property," the government must prove an object of the scheme was to obtain it to sustain a wire fraud conviction. *Id.* at 1571–72. *Kelly* also noted that there were no doubt labor costs associated with the issuance of Louisiana gaming licenses in *Cleveland*, but the object of the scheme was to obtain the licenses, not employee labor. *Id.* at 1573.

In this case, a LexisNexis representative testified how LexisNexis profits from the sale of crash reports to the public. LexisNexis set its own convenience fee (for storage and handling) and DPD set the amount it wanted back, which essentially defined the total price. (Trial Transcript, ECF No. 505, PageID.10741 and PageID.10752.) During its questioning of this witness, the government implied LexisNexis was a victim because it was deprived of its right to sell the crash reports to the defendants or to others, or some more speculative theory of harm such as lost sales. (Id. at PageID.10753.) The government argued lost profits in its closing argument, despite a lack of evidence of any loss by LexisNexis. (Trial Transcript, ECF No. 527, PageID.11393.)

However, the government presented no evidence concerning the final status of any of the crash reports admitted into evidence. There was no evidence any of these crash reports were approved by a DPD supervisor as complete and received a

11

final approval allowing LexisNexis to sell copies of such reports.  Nor was there evidence LexisNexis was unable to sell any of the crash reports admitted at trial.

Here, like in *Kelly*, there was a scheme to gain access to crash reports. Depriving LexisNexis of a potential sale (or some other attenuated economic impact), if true, is not distinguishable from the costs associated with issuing a gaming license in Louisiana or paying an extra toll worker to work on the George Washington Bridge.  No reasonable juror could have concluded Angelo joined a conspiracy with any object other than to obtain crash reports, which are not "property" under the wire fraud statute.

Accordingly, there is insufficient evidence to establish LexisNexis was deprived of any property right because of the alleged conspiracy.  And even if it was so deprived, there is no evidence establishing that such deprivation was more than an incidental implementation cost of the alleged conspiracy.

For the foregoing reasons, there was insufficient evidence to sustain a conviction for conspiracy to commit wire fraud because there is no evidence the defendants intended to obtain property from the DPD.  And any taking of property from LexisNexis was "incidental."

Importantly, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Cleveland*, 531 U.S. at 25.  The rule of lenity requires ambiguity in the meaning of a criminal statute be "resolved in favor of the

defendant." *United States v. Bass*, 404 U.S. 336, 348 (1971).  Here, lenity requires

any doubts concerning the meaning of "property" in the wire fraud statute be

resolved in Angelo's favor.

**B.**     **John Angelo should be acquitted on count one because the government failed to prove he knowingly joined a conspiracy to commit wire fraud.**

Even if crash reports are "property," Angelo is entitled to a judgment of

acquittal on count one because, based on the government's proofs, no rational trial

of fact could have found that Angelo knowingly joined and/or participated in a

wire fraud conspiracy.

Count one charges conspiracy to commit wire fraud in violation of 18 U.S.C.

§ 1349.  The government theory for this count is stated in the Indictment as

follows:

> To accomplish the object of this conspiracy and scheme and artifice to defraud, from at least in or about July of 2014 through on or about April 18, 2018, KAREN MILLER transmitted through electronic wire in interstate commerce CAROL ALMERANTI's DPD username and password to ENTITY C databases falsely representing to ENTITY C and others that she was CAROL ALMERANTI to fraudulently obtain Crash Reports not yet available to the public, for the purpose of distributing the Crash Reports to JAYSON PAUL ROSETT and others.

(ECF No. 441, ¶ 44, PageID.9111.)

Jury Instruction No. 12 states what the government must prove in regards to

the conspiracy as follows:

13

(2) A conspiracy is a kind of criminal partnership. For you to find the defendants guilty of the conspiracy charge, the government must prove each and every one of the following elements beyond a reasonable doubt:

(A) First, that two or more persons conspired, or agreed, to commit the crime of wire fraud.
(B) Second, that the defendants knowingly and voluntarily joined the conspiracy.

(Jury Instructions, ECF No. 514, PageID.11095)

1.   <u>There was no evidence Angelo knew of a conspiracy or scheme to obtain crash reports by fraud.</u>

Based on the evidence presented at trial, no reasonable juror could have concluded the government met its burden to prove Angelo knowingly joined a preexisting "scheme" involving Karen Miller and Carol Almeranti to obtain crash reports by fraud.

It is undisputed that Almeranti and Miller obtained "unapproved" DPD crash reports and sent them to email addresses provided by Robert Rosett.  However, the government presented no evidence that Angelo was aware of the method by which the crash reports were obtained (*e.g.*, theft or fraud).  These reports could easily have been taken from someone's desk at DPD, scanned, and then emailed.  Absent evidence of Angelo's knowledge, it is not possible for a reasonable juror to conclude beyond a reasonable doubt that Angelo knowingly joined a conspiracy to obtain crash reports by fraud.

"[K]nowledge and intent to join the conspiracy includes that the defendant 'was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives.'" *United States v. Williams*, 998 F.3d 716, 729 (6th Cir. 2021) (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). "It is well established that one who has no knowledge of the object of a conspiracy cannot be a conspirator, for the intent to participate is lacking." *Stanley v. United States*, 245 F.2d 427, 430 (6th Cir. 1957); *United States v. Morrison*, 220 Fed. Appx. 389, 393 (6th Cir. 2007) ("Without the knowledge, the intent cannot exist.") (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)).

To obtain a conviction, "evidence of knowledge must be clear, not equivocal." *Morrison*, 220 Fed. Appx. at 393, quoting *Direct Sales Co.*, 319 U.S. at 711. "It is not enough for [the evidence] merely to establish a climate of activity that reeks of something foul." *Morrison*, 220 Fed. Appx. at 393, quoting *United States v. Wright,* 12 F.3d 215, 1993 WL 465164, at *4 (6th Cir. Nov. 10, 1993) (per curiam) (alteration in original)). "Clearly, the emerging and consistent principle is that 'conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction.'" *Morrison*, 220 Fed. App'x. at 395 (quoting *United States v. Coppin*, 1 F. App'x. 283, 291 (6th Cir. 2001) (unpublished)); *United States v. Gibbs*, 182 F.3d 408 (6th Cir.1999) (court

vacated conspiracy convictions due to lack of evidence of knowledge and participation in the conspiracy's alleged object—"excluding outsiders").

The Third Circuit reversed a marijuana distribution conspiracy conviction because the government did not unequivocally establish the defendant knew of a goal to transport marijuana.  *United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988)[5]. Even though evidence at trial was sufficient to establish that the defendant actually knew "some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated, these permissible inferences do not support a holding that the government met its burden to prove beyond a reasonable doubt that [the defendant] knew this was a conspiracy to transport hashish or even another controlled substance.'"  *Wexler, 838* F. 2d at 92; *see also United States v. Thomas*, 114 F.3d 403, 405 (3d Cir. 1997).  Indeed, in *Wexler*, "[t]he evidence [was] just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime."  *Wexler, 838* F. 2d at 92*; see also Morrison*, 220 Fed. Appx. at 396 ("While there is something 'fishy' about Morrison's motivation for initiating this discussion, we have consistently held that 'the government's case will not succeed merely because there is something 'fishy' about the defendant's conduct.'") (quoting *Coppin*, 1 F. App'x at 291).

---

[5]     Cited with approval in *Morrison*, 220 Fed. Appx. at 394.

Moreover, knowledge of illegal activity, even in conjunction with participation in a small part of the conspiracy, does not by itself establish that a person has joined in the grand conspiracy." *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992).  In *Evans*, the Tenth Circuit held a drug dealer was not part of a large drug cartel even though the dealer knew he was purchasing drugs from the cartel and then independently distributing them.  *Id.*  Indeed, "[a] buyer/seller relationship alone is not enough to establish participation in the conspiracy, but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." *Gibbs*, 182 F.3d at 421–22.

At the trial of this case, there was no evidence presented to establish Angelo "devised the scheme" to obtain crash reports from DPD or LexisNexis, or knowingly joined it.  The only reasonable conclusion the trial evidence allows is that Miller, Almeranti, Robert Rosett, Jayson Rosett, and a county judge devised a scheme to obtain crash reports to benefit Jayson.  When Jayson decided he no longer wanted to personally use the reports, the reports were sold to others, including Schwartz.

Jayson Rosett testified that he sought his father's help (Robert) to get crash reports before they were publicly available.  (Trial Transcript, ECF No. 503, PageID.10305.)  His access to nonpublic crash reports through Robert's connection started in 2012.  (Id.)  At some point, Jayson decided he no longer wanted to use

the reports to solicit crash victims for his business even though the reports kept coming to him via email.  (Id. at PageID.10307.)  He therefore offered to sell them to attorney Matthew Schwartz who agreed to pay for them as he had "peeps" or people who needed the reports.  Jayson sold crash reports to others, including a business named Elite and a Dr. Bitner.  (Id. at PageID.10328, 10340–341.) Schwartz provided Jayson with email addresses to send the crash reports to and Jayson gave the addresses to his father Robert.  (Id. at PageID.10308.)  In exchange for the reports, Jayson picked up cash from Schwartz's barbecue located in his backyard.  (Id. at PageID.10310.)

Jayson did not know Angelo or any of the defendants on trial.  (Id. at PageID.10333.)  He never met Miller or Almeranti.  (Id. at PageID.10331.)  Jayson agreed that the goal was for Schwartz and his people not to know the source of the reports because they could cut him out and go to it themselves.  (Id. at PageID.10332.)  He stated that he never revealed the source of the reports to anybody other than saying they came from two women at the police department but he added "no one asked, no one asked."  (Id. at PageID.10346–347.)

Robert Rosett testified that he was interested in getting crash reports for Jayson in order to get leads for his therapy business.  He was invited by a county judge to meet with a police officer (he was not sure if it was Miller or Almeranti) in order to discuss how to obtain crash reports.  (Id. at PageID.10372.)  The crash

reports were delivered by email.  Robert never met Schwartz (id. at PageID.10374) and never heard of or met John Angelo or the other defendants on trial (id. at PageID.10377).  And remarkably, Robert testified that he was not aware how Miller or Alemeranti obtained the crash reports or that the two used credentials to access them.  (Id. at PageID.10376.)

Matthew Schwartz confirmed Robert's and Jayson's testimony.  (Trial Transcript, ECF No. 506, PageID.10868–873.)  Schwartz testified that he did not tell Angelo who his source for the reports was (id. at PageID.10876) or that it was Jayson (id. at PageID.10879).  When asked about whether he knew where Jayson got the reports, he answered "Not precisely, but I was told that he got them from somebody who worked in IT, from Detroit Fire."  (Id.)

Aaron Korson, a law student at the time, was a paid government informant, who at times worked closely with Angelo and others involved in the case.  Korson provided no evidence that he, Angelo, or others knew the method as to how the crash reports were obtained.

When asked specifically about his knowledge concerning the source of the DPD crash reports used by Angelo and others, Korson stated that it "was an **insider, inside** the Detroit Police Department."  (Trial Transcripts, ECF No. 504, PageID.10544, emphasis added.)  He also said that he knew this because "it was discussed by John Angelo", without providing any further details.

19

Q. Okay. Did you also develop knowledge based on your own understanding of how the crash reports were obtained?
A. Yes.
Q. What did you learn the source was?
A. An individual **inside** of the Detroit Police Department.
Q. And were you able to determine how that individual was getting the reports to Defendant John Angelo?
A. Yes.
Q. What was that? How was he getting them -- how was that person getting them there?
A. **They have to get them** through an online database.

(Id. at PageID.10546, emphasis added.)

Korson's claimed knowledge of an online database is based on speculation and falls short of proving knowledge of a fraudulent method of obtaining reports. He assumed the reports came from an online database "[b]ecause [he believed] it was impossible to gain access to these police reports otherwise."  (Id.)

Anthony Sereno was one of the people who worked closest with John Angelo during the relevant years.  Sereno lacked knowledge concerning the source or method of obtaining crash reports.  During oral arguments on the Rule 29 motion right after the government rested, the Court noted:

I'm trying to make this as simple for you as I can. In my mind, Anthony Sereno's testimony does not add to the government's case of whether these defendants knew where the reports were coming from, because he testified he didn't know where Matthew Schwartz got the reports from, and he didn't, in my view, clearly testify to a conversation where these defendants told him they knew. End of discussion on Sereno.

(Trial Transcript, ECF No. 525, PageID.11332.)

Sereno testified that Schwartz told him he had an insider who would get the reports from IyeTek.  (Trial Transcripts, ECF No. 513, PageID.10970.)  But then stated that he and Angelo "were *assuming* that they were coming from IyeTek." (Id. at PageID.10971 (emphasis added).)  Sereno stated that he asked Schwartz more than once where he got the reports and the most Schwartz would say was that he got them from CLEMIS.  (Id. at PageID.11052.)

John Capella also lacks personal knowledge concerning how crash reports were obtained.  Capella testified that, around 2014, he surmised the crash reports were coming from "retired Deputy Chief Karen Miller" who was sending them to Jayson Rosett.  (Trial Transcripts, ECF No. 503, PageID.10415.)  He learned this by hacking a physician's email.  (Id. at PageID.10416.)  He stated that the reason he knew Miller was retired in October 2014 or about to retire was because it was mentioned in the emails he obtained.

Capella testified that at some point, Angelo told him the source of the crash reports was a high ranking person in the DPD, who gave them to a councilman, who gave them to Tracy Varjabedian's law firm, who, finally, gave them to Anthony Sereno (Angelo's partner).  (Id. at PageID.10418–419.)  Capella provided no testimony evidencing that either he or Angelo actually knew the method by which this source was obtaining the crash reports.

No fact witness, other than Almeranti and Miller could have personal knowledge that the crash reports were obtained by the fraud alleged in the indictment.  There is no evidence Angelo had such knowledge.  Angelo is entitled to a judgment of acquittal on count one as a result.

2.     The government failed to prove the existence of an underlying wire fraud conspiracy between Almeranti, Miller, and anyone else.

Not only was there no evidence Angelo knew crash reports were obtained by the fraud alleged in the indictment, there is no evidence Miller and Almeranti formed a wire fraud conspiracy or a scheme which Angelo could even join.

Wire fraud requires proof of intent to defraud (to deceive or cheat) by making a representation of material fact.  (Jury Instructions, ECF No. 514, PageID.11097.)  The government's theory of fraud in this case was that Miller's use of Almeranti's password was a misrepresentation and that it violated a user agreement between LexisNexis and the DPD concerning the use of an information portal containing crash reports.  (Id. at PageID.11096 and Trial Transcript, ECF No. 504, PageID.10492–494.)

In this vein, the government presented evidence from LexisNexis and introduced an end user agreement to establish that the use of Almarenti's password was a violation of such agreement and a material misrepresentation.  (Gov. Exhibit No. 80035F, Trial Transcript, ECF No. 505, PageID.10734.)  But there was no evidence that Miller, Almeranti, or Angelo had knowledge of this end user license

agreement.  No testimony about checking a box on a computer screen to acknowledge it when downloading reports through DPD's web portal.  No testimony concerning training or instruction Almeranti or Miller received concerning use of the portal.  Nothing.  Accordingly, the government failed to establish Miller or Almeranti devised a scheme or conspiracy to commit a wire fraud that could be joined.

Almarenti testified that she was hired to provide reports for use by Robert Rosett's son to help his business.  (Trial Transcript, ECF No. 504, PageID.10630.) She also testified that she shared her name and password with Miller even though Miller was retired at the time.  (Id. at PageID.10634.)  She did not think there was anything wrong with providing the crash reports because a county judge had given her assurances about that, neither did she think she was breaking federal law.  (Id. at PageID.10649–650.)  She never discussed with a supervisor what she could or could not do in relation to downloading the reports and she was never told that if she took a report, it was to be used for official business.  (Id. at PageID.10661.) She pled guilty to theft from an organization receiving federal funds even though she did not know that DPD received federal funds.  (Id. at pageID.10653.)  She never met or heard of Angelo.  (Id. at PageID.10654.)  She had no idea where the reports would end up.  (Id. at PageID.10656.)

Miller testified similarly to Almeranti.  She never met Angelo or heard of him before the case started.  (Trial Transcript, ECF No. 503, PageID.10283.)  She believed the reports were meant only for Jayson Rosett and did not know that any of the defendants in the case were getting the reports.  (Id. at PageID.10296–297.) She did not know where the reports were stored, she just used Almeranti's credentials on a website.  (Id. at PageID.10273.)  She received assurances from a county judge that what she did was above board.  (Id. at PageID.10283.)  She pled guilty to theft from an entity funded by the federal government even though she never knew who the theft was from.  (Id. at PageID.10286.)  She did not think there anything wrong with what she did.  (Id. at PageID.10288.)

Absent testimony that Miller and/or Almeranti knew the use of Almeranti's credentials was a misrepresentation, there can be no wire fraud scheme for Angelo to join.

The evidence presented by the government at trial at most proves that Angelo and others paid for "unapproved" DPD crash reports before they were made available to the public.  Even if, as the government argued at times, Angelo knew or should have known that the reports came off a database (as opposed to being taken off a desk and scanned), there was no evidence that he knew they were obtained by a misrepresentation or fraud.  Viewed in the light most favorable to the government, the evidence at most could show that Angelo should have known

something wrong was happening.  But the evidence does not allow for a reasonable

conclusion that Angelo knew the something wrong involved misrepresentation or

fraud.  At the conclusion of the *Enright* hearing, this Court found that the

government did not prove, by a preponderance of the evidence, that the wire fraud

conspiracy alleged in the indictment existed or that the charged defendants,

including Angelo, were members of it.  (*Enright* Ruling, ECF No. 484,

PageID.9946.)  A reasonable jury cannot make a different finding under the higher

"beyond a reasonable doubt" standard considering that the evidence presented at

trial did not add to the evidence presented at the *Enright* hearing in any meaningful

way.  Accordingly, Angelo is entitled to a judgment of acquittal on count one.

## Conclusion

For the reasons stated above, the defendant's motion for a judgment

of acquittal on count one should be granted.

Respectfully submitted,

/s/ Abed Hammoud
Abed Hammoud
Abed Hammoud Law, PLLC
645 Griswold St., Suite 1717
Detroit, Michigan 48226
Tel: (313) 303-0427
E-mail: abed@abedhammoudlaw.com
*Attorney for John Angelo*

Date:  January 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed this brief using the ECF system which will send notification of the filing to all counsel of record included in the ECF system.

Respectfully submitted,

 /s/ Abed Hammoud
Abed Hammoud
Abed Hammoud Law, PLLC
645 Griswold St., Suite 1717
Detroit, Michigan 48226
Tel: (313) 303-0427
E-mail: abed@abedhammoudlaw.com
*Attorney for John Angelo*